UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LINDA ISNER,** as Executrix of the )<br>**ESTATE OF JEFFREY ISNER**, **M.D.,** )<br>   Plaintiff, )<br> )<br>v. )<br> )<br>**MERCK & CO., INC.** )<br>and **KIMBERLY HENDRICKS**, )<br>   Defendants. )<br> ) | CIVIL ACTION NO. 05-10328-DPW |

**MEMORANDUM OF REASONS FOR GRANTING THE MOTION OF
THE PLAINTIFF, LINDA ISNER, TO REMAND THIS ACTION TO
THE MIDDLESEX COUNTY SUPERIOR COURT OF MASSACHUSETTS**

I.    **Introduction**

      This is an action alleging negligence, intentional misrepresentation, negligent

misrepresentation, wrongful death, product liability/breach of warranty and failure to

warn, under Massachusetts law, against two defendants, Merck & Co., Inc., (hereinafter

"Merck"), and one of Merck's former sales representatives, Kimberly Hendricks,

(hereinafter "Hendricks").  The action arises out of the distribution of the drug Vioxx, by

the defendant, Hendricks, to the plaintiff's decedent, Jeffrey Isner, M.D.  Dr. Isner took

Vioxx, which he received directly from the defendant, Hendricks, on a regular basis over

a period of approximately two years.  On October 31, 2001, Dr. Isner, who was otherwise

in excellent health, died unexpectedly of a heart attack, which the plaintiff in this action,

Linda Isner, (hereinafter "Isner"), alleges was directly caused by her husband's use of

Vioxx supplied by Hendricks. (Complaint – Paragraph 14).

1

On September 17, 2001, approximately one month prior to Dr. Isner's death, the defendant, Merck, received a written warning from the FDA, advising Merck that it's methods and practices in marketing, promoting, advertising and distributing Vioxx, through its sales representatives and through other channels, were in violation of FDA standards and regulations, due to the fact that Merck knew that studies performed relating to Vioxx had demonstrated a significantly increased cardiovascular risks associated with the drug but, nevertheless, promoted Vioxx as having essentially no cardiovascular risks. (Complaint – Paragraphs 10 and 11; see also, copy of September 17, 2001, FDA Warning Letter, attached hereto as Exhibit "A").[1]

Rather than following the FDA's September 17, 2001, request that Merck and its sales representatives undertake "a comprehensive plan to disseminate corrective" information, which would include issuing a "Dear Healthcare provider" letter by direct mail to "all healthcare providers who were, or may have been exposed to the violative promotion" of Vioxx, in an attempt to. "correct false or misleading impressions and information",  (Exhibit "A"), Merck challenged the letter and refused to comply with the FDA's warning's until approximately April, 2002, five months after Dr. Isner's death.  If Merck and its sales representatives had complied immediately with the FDA's September 17, 2001 warning, Dr. Isner would more than likely have received such a "Dear Healthcare provider" letter, due to his regular interaction with Merck's sales representative, the defendant, Kimberly Hendricks.

---

[1] As stated in the paragraph entitled "Oral Representations", within the September 17, 2001, Warning Letter from the FDA to Raymond V. Gilmartin, President and CEO of Merck:

> "Merck ***sales representatives have engaged in false or misleading promotional activities***
> that also minimize the potentially serious MI results observed in the VIGOR trial".

(Emphasis supplied).

Merck's refusal to comply with the FDA's Warning Letter was consistent with its prior deceptive marketing practices relating to Vioxx, which did not come to light until after Merck withdrew Vioxx from the market on September 30, 2004, due to the substantial cardiovascular risks associated with the drug. As described in a November 4, 2004, on-line article from the British Medical Journal, *The Lancet*, (copy attached hereto as Exhibit "B"), those marketing practices included "a document intended for its sales representatives which discussed how to respond to questions about Vioxx—it was labeled 'Dodge Ball Vioxx'."[2]

## II.    Procedural Background

The plaintiff filed the Complaint in this matter on October 29, 2004, and served the Complaint upon Merck on January 31, 2005. On January 27, 2005, the Middlesex County Superior Court had allowed a Motion to Extend the time for service, as to both defendants, until April 27, 2005. The defendant, Merck, removed the action to the United States District Court for the District of Massachusetts on February 18, 2005. The plaintiff does not challenge the fact that the amount in controversy exceeds $75,000.

---

[2]    Although no discovery has been provided at the present stage of this litigation, the plaintiff anticipates that discovery will demonstrate that the defendant, Kimberly Hendricks, working as a sales representative employed by Merck, received similar instructions to "dodge" questions asked by physicians, such as Dr. Isner, concerning the cardiovascular risks of Vioxx.

The plaintiff's investigation to date has identified more than 50 Massachusetts residents with the name Kimberly Hendricks or K. Hendricks. On January 31, 2005, the plaintiff served initial interrogatories upon Merck, with the Complaint, requesting Ms. Hendricks' address, so that the plaintiff's may serve the Complaint upon her, within the extension of time for service, granted by the Middlesex Superior Court, through April 27, 2005. To date, Merck has not responded to the plaintiff's interrogatories.

However, the plaintiff does contest Merck's claim of fraudulent joinder, which is the sole ground asserted by Merck for removal.

Although the 30 day period set forth in 28 USC § 1447(c), does not apply to the plaintiff's present Motion to Remand, (because the Motion challenges removal exclusively on the ground of lack of subject matter jurisdiction), the plaintiff has nonetheless filed her Motion to Remand and the present Memorandum on Monday, March 21, 2005, the first business day after the 30 day period after the Notice of Removal. The plaintiff submits, based upon the factual allegations against the defendant, Hendricks, as set forth in the Complaint, that Merck cannot meet its burden of establishing fraudulent joinder. Consequently, there is incomplete diversity, this court lacks subject matter jurisdiction and the matter must be remanded to the Middlesex County Superior Court of Massachusetts.

III.    **The Notice of Removal Incorrectly Describes the Allegations Against Kimberly Hendricks in the Complaint, Mischaracterizes the Nature of Those Allegations and Fails to Identify or Reference the Specific Allegations Within the Complaint Establishing the Legitimate Basis for the Plaintiff's Claims Against the Defendant, Kimberly Hendricks**

In the course of her work as a marketing representative employed by Merck, Ms. Hendricks regularly provided the plaintiff's decedent, Jeffrey Isner, M.D., with the drug Vioxx, which he took over a period of approximately two years, resulting in his death on October 31, 2001. (Complaint – Paragraph 14). Merck's Notice of Removal conspicuously omits any reference to this direct and specific allegation in the Complaint, and overlooks numerous additional factual allegations relating specifically to Ms.

Hendricks, as well as allegations directly relating to both Merck and Hendricks. In

paragraph 5 of the Notice of Removal, Merck states, incorrectly, that:

> The **_only_** specific factual allegation that the Plaintiff makes as to Ms.
> Hendricks is that she 'is an individual residing in Massachusetts and was,
> at all times relevant to this case, an employee, agent, servant, and/or
> marketing representative for the defendant, Merck.' Complaint ¶ 3.

(Emphasis supplied). Based upon even a cursory reading of the Complaint, Merck's

statement is obviously untrue. The Complaint clearly presents specific factual allegations

exclusively against Ms. Hendricks in paragraphs 3, 7, 9, 14, 25, 26, 27 and 28.

Paragraphs 10, 13, 15, 18, 30, 31, 32, 33 and 35 of the Complaint present allegations

pertaining to **both** Merck and Hendricks. Count II of the Complaint is directed entirely

to the plaintiff's claims of negligence and wrongful death against the defendant

Hendricks alone; it does not contain any claims or allegations pertaining directly to

Merck. Counts III and IV of the Complaint present claims specifically pertaining to both

Hendricks and Merck.

The Notice of Removal goes on to suggest, in paragraph 6, that the decision of the

11th Circuit, in *Tillman v. RJR Nabisco, Inc.,* 253 F. 3d 1302, 1305 (11th Cir. 2001),

supports Merck's contention that Ms. Hendricks was fraudulently joined as a defendant

in this action, citing the following language from *Tillman*:

> There is no claim that the plaintiff ever dealt with any of them, or that they
> made any representations on which the plaintiff relied to start or continue
> smoking. . . .

By contrast, the Complaint in the present action alleges specifically that the

defendant, Hendricks, had direct contact with Dr. Isner, made specific misrepresentations

concerning the cardiovascular risks associated with Vioxx, "negligently marketed,

promoted and distributed Vioxx, prior to October 31, 2001," and actually supplied Dr.

Isner with the Vioxx that he took "on a regular/daily basis" for approximately "two years prior to his death on October 31, 2001". (Complaint – Paragraphs 6, 9 and 14). Merck concludes paragraph 6 of the Notice of Removal by stating, without any factual basis or any reference to the plaintiff's allegations, that the Complaint "does not connect any conduct of Ms. Hendricks, to the decedent's consumption of Vioxx". Again, Merck's statement is blatantly inaccurate and is directly contradicted by paragraph 14 of the complaint, which states:

> Plaintiff's decedent, Jeffrey Isner, on a regular/daily basis, took Vioxx that was provided to him by Merck, ***through its representative Kimberly Hendricks,*** for approximately two years prior to his death on October 31, 2001.

(Emphasis supplied). The fact that Ms. Hendricks supplied Dr. Isner with the Vioxx that he took for approximately two years prior to his death certainly amounts to a connection between the "conduct of Ms. Hendricks" and "the decedent's consumption of Vioxx".

A further inaccurate statement by Merck is its suggestion, in paragraph 8 of the Notice of Removal, that "(c)omplete diversity is preserved in this action, notwithstanding ***the presence of Ms. Hendricks's name in the caption***". (Emphasis supplied). Obviously, the Complaint sets forth multiple, specific, factual allegations directly against Ms. Hendricks, far beyond the simple presence of her "name in the caption".


## IV.    Argument

As the 5th Circuit acknowledged in *Travis v. Irby,* 326 F.3d 644, 649 (5th Cir. 2003), the burden of proving fraudulent joinder placed upon a party removing a state court action to a United States District Court "is a heavy one". District Judge O'Toole, of this Court, noted in *Tepaske v. Delgado*, 2003 U.S. Dist. LEXIS 23638, U.S.D.C.,

Massachusetts, Civil Action No. 03-CV-l1535-GAO, at page 4: "Any doubts concerning diversity should be resolved against jurisdiction and in favor of remand to the state court, *Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3d Cir. 1990)".[3]  As this Court held in *DiCostanzo v.Trymax,* 1988 U.S. Dist. LEXIS 17951, U.S.D.C., Massachusetts, Civil Action No. 88-147-WD, at page 3, the language of the removal statute, 28 USC § 1441(b), is not "hazy, ambiguous or susceptible to varying interpretations: a diversity case simply cannot be removed if any defendant is a resident of the state in which the suit was brought".

Many recent decisions of federal trial and appellate courts in other jurisdictions have addressed the heavy burden placed upon a party seeking removal based upon alleged fraudulent joinder and the legal standards to be followed in determining whether joinder is proper, in order to defeat removal on diversity grounds.  In *Travis v. Irby,* 326 F.3d 644, 649 (5th Cir. 2003), the 5th Circuit discussed the fact that standards applied by various courts often appear to be in conflict and observed that "Neither our circuit nor other circuits have been clear in describing the fraudulent joinder standard. The test has been stated by this court in various terms, even within the same opinion". *Id.,* at 647.  By

---

[3] In *Bally v. NCAA*, 707 F. Supp. 57, 58 (D. Mass. 1988), Judge Keeton, of this Court, observed that "the trend of decisions is that removal statutes will be strictly construed and that doubts should be resolved against removal. *See Butler v. Polk*, 592 F.2d 1293, 1296 (5th Cir. 1979) (stating that "it is axiomatic that ambiguities are generally construed against removal"); *Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976) (stating that "the case should be remanded if there is doubt as to the right of removal in the first instance"). There are two reasons for this trend. First, a plaintiff's choice of forum should not be denied lightly. Second, major inefficiencies result where a district court's decision that removal was proper is ultimately overturned on appeal after a full trial on the merits".

way of example, it cited the following language from *Griggs v. State Farm Lloyds*, 181

F.3d 694, 698 (5th Cir. 1999):

> To establish that a non-diverse defendant has been fraudulently joined to defeat diversity, the removing party must prove . . . that there is ***absolutely no possibility*** that the plaintiff will be able to establish a cause of action against the non-diverse defendant in state court.

*Griggs*, at 699. (Emphasis supplied).  The Court in *Griggs* also held:

> Stated differently, we must determine whether there is ***any reasonable basis*** for predicting that [the plaintiff] might be able to establish [the non-diverse defendant's] liability on the pleaded claims in state court.

*Griggs*, at 699. (Emphasis supplied).

The *Travis* Court noted that "(a)lthough these tests appear dissimilar, 'absolutely

no possibility' vs. 'reasonable basis,' we must assume that they are meant to be

equivalent because each is presented as a restatement of the other". *Travis*, at 647.

Coordinating the intent of the above language, the *Travis* Court held:

> The court determines whether that party has ***any possibility of recovery*** against the party whose joinder is questioned. If there is arguably a ***reasonable basis*** for predicting that the state law might impose liability on the facts involved, then there is no fraudulent joinder. This ***possibility, however, must be reasonable***, not merely theoretical.

*Travis*, at 648. (Emphasis supplied).

Applying the *Travis* test to the allegations to the present Complaint against Ms.

Hendricks demonstrates that there clearly a reasonable possibility that liability might be

imposed upon Ms. Hendricks under Massachusetts law and that the Complaint does not

simply create a theoretical possibility.  Acting on behalf of Merck, Ms. Hendricks had

direct contact with Dr. Isner on a regular basis over approximately two years.  She

supplied him with the Vioxx that is alleged to have caused his death.  The Complaint

alleges that during the course of her direct contact with Dr. Isner, she negligent and/or intentionally misrepresented known cardiovascular risks associated with Vioxx that she knew or should have known.  Liability is also alleged due to fact that Ms. Hendricks failed to warn Dr. Isner of these substantial cardiovascular risks.

Ms. Hendricks' conduct is analogous to the conduct of the non-diverse defendant doctor in *Lauderdale v. Merck*, 219 F. Supp. 2d 747 (N.D. Miss. 2002), who prescribed Vioxx to the plaintiff's deceased wife prior to her death.  In *Lauderdale*, the Court stated:

> The party alleging fraudulent joinder bears the burden of persuasion, and that burden is quite stringent. In order to prove that a non-diverse party has been fraudulently joined by a plaintiff hoping to defeat diversity, the removing party must demonstrate either "outright fraud in the plaintiff's recitation of jurisdictional facts," or that there is "absolutely no possibility that the plaintiff will be able to establish a cause of action against the in-state defendant[s] in state court."  In connection with this inquiry, the Fifth Circuit has made clear that the removal statutes are to be construed "strictly against removal and for remand."

*Lauderdale,* at 749. (Internal citations omitted).  The Court in *Lauderdale* allowed the plaintiff's Motion to Remand, over Merck's objections, ruling:

> In sum, the Plaintiff's complaint, ***taking all allegations set forth as true and resolving all uncertainties of the relevant state law in favor of the Plaintiff, at least raises the possibility*** that he could succeed in establishing a tort claim against the Defendant Dr. Johnson in state court. Accordingly, Johnson's citizenship cannot be ignored for the purposes of determining subject matter jurisdiction. His presence in this civil action means that the complete diversity of citizenship necessary to maintain federal jurisdiction over this case is absent. As such, this cause shall be remanded to the Circuit Court of Prentiss County for ultimate resolution.

*Lauderdale,* at 751. (Emphasis supplied).

The claims against the defendant, Hendricks, in the present action are also analogous to the claims against the non-diverse latex glove supplier in *Mills v. Allegiance*

9

*Healthcare Corporation*, 178 F. Supp. 2d 1 (D. Mass. 2001). Although the defendant,

Merck, relies upon the *Mills* decision in support of its Notice of Removal, that reliance is

misplaced. District Judge Saris did ***not*** deny the plaintiff's Motion to Remand in *Mills*

based upon a determination that the plaintiff's claims against the glove distributor were

not valid under Massachusetts law. Rather, she denied the Motion to Remand based

solely upon the fact that the distributor, The Claflin Company, did not begin supplying

the defendant manufacturer's brand of gloves to the hospital, at which the plaintiff was

employed as a nurse, until ***after*** the plaintiff contracted the latex allergy he claimed as the

basis for his damages in the action. Judge Saris explained that but for this temporal

discrepancy in the plaintiff's claims against the distributor, his claims would otherwise

state valid causes of action against the distributor. *Mills*, at 7-8. As the Court noted:

> ***Massachusetts law imposes liability on distributors of products for
> breach of an implied warranty and for negligence.*** Massachusetts
> imposes strict liability on distributors of products, ***even those who act
> merely as a conduit and neither alter the product nor contribute to its
> injuriousness***. Under Massachusetts law, a plaintiff can recover for
> negligence and breach of warranty, express or implied, if the plaintiff was
> a person whom the manufacturer, seller, lessor ***or supplier*** might
> reasonably have expected to use, consume, "or be affected by the goods."
> Plaintiffs allege that Claflin failed to provide adequate warnings for the
> safe use of latex gloves and sold an unreasonably dangerous product. As a
> practicing nurse, Charles Mills was not only a reasonably foreseeable user
> of latex gloves, but also a person whom Claflin could have reasonably
> expected to be affected by its product. Therefore, Plaintiffs have stated a
> cognizable claim under Massachusetts law against Claflin.

*Mills*, at 7. (Emphasis supplied). (Internal citations omitted). [4]

---

[4]   Judge Saris also reiterated the strict burden placed upon a party seeking to establish
fraudulent joinder, stating:

> The linchpin of the fraudulent joinder analysis is whether the joinder of the
> non-diverse party ***has a reasonable basis in law and fact***. Although the First
> Circuit has not articulated a standard for evaluating a claim of fraudulent

The present action is distinguishable from decisions such as *Staples v. Merck,* 270 F. Supp. 2d 833 (N.D. Tex. 2003), also involving claims relating to Vioxx, in which the court denied the plaintiff's Motion to Remand and found fraudulent joinder, based upon the fact that the non-diverse defendants were simply clinical researchers, rather than employees of Merck, who had no contact, direct or otherwise, with the plaintiffs, and simply conveyed research data to Merck that they, themselves had no part in interpreting or analyzing. The Court noted that the clinical researchers made no representations to any of the plaintiff, or to anyone, concerning the risks of Vioxx, nor could they have even been aware of those risks based upon their limited involvement with the clinical studies in question. The conduct of Ms. Hendricks in the present case is substantially greater, with respect to her interaction with Dr. Isner, than the conduct of the clinical researches in *Staples*.

---

joinder, it has stated in dicta that "a finding of fraudulent joinder bears an implicit finding that the plaintiff has failed to state a cause of action against the fraudulently joined defendant." The Second Circuit articulated the following useful disjunctive test:

> In order to show that naming a non-diverse defendant is a "fraudulent joinder" effected to defeat diversity, the defendant must demonstrate, by *clear and convincing evidence*, *either* that there has been *outright fraud* committed in the plaintiff's pleadings, or that there is *no possibility*, based on the pleadings, that the plaintiff can state a cause of action against the non-diverse defendant in state court.

*Mills*, at 4-5. (Emphasis supplied). (Internal citations omitted).

## V.    Conclusion

For the reasons stated above, and the grounds set forth in the plaintiff's Motion to Remand, the plaintiff states that there is no factual or legal basis to support the claim by the defendant, Merck, that the defendant, Kimberly Hendricks, was fraudulently joined as a defendant in this action. Consequently, there is incomplete diversity among and between the parties, precluding jurisdiction by this Court and requiring remand to the Middlesex County superior court of Massachusetts.

Respectfully submitted,

**PLAINTIFF, LINDA ISNER, AS EXECUTRIX OF THE ESTATE OF JEFFREY ISNER, M.D.**

By her attorney,

**/S/ Joseph L. Doherty, Jr.**
Joseph L. Doherty, Jr.
BB0 No. 127280
JOSEPH L. DOHERTY, JR. AND ASSOCIATES
225 Franklin Street, 26th Floor
Boston, Massachusetts 02110
(617) 217-2837

DATED:  March 21st, 2005

.

12

## EXHIBIT "A"

**Released by FDA:** 9/17/01.  **Posted by FDA:**  9/21/01

Raymond V. Gilmartin
President and CEO
Merck & Co., Inc.
P.O. Box 1000, UG3BC-10
North Wales, PA 19454-1099

RE:   **NDA 21-042**
       Vioxx (rofecoxib) tablets
       MACMIS ID # 9456

## WARNING LETTER

Dear Mr. Gilmartin:

This Warning Letter concerns Merck & Co. Inc.'s (Merck) promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets.  Specifically, we refer to promotional audio conferences given on behalf of Merck by Peter Holt, MD, a press release, and oral representations made by Merck sales representatives to promote Vioxx. As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f), and (n), and 355 (a).

You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx.  Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal antiinflarnmatory drug (NSAID), Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs.  You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin.  That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by

substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

You have also engaged in promotional activities that minimize the Vioxx / Coumadin (warfarin) drug interaction, omit important risk information, make unsubstantiated superiority claims against other NSAIDs, and promote Vioxx for unapproved uses and an unapproved dosing regimen. In addition, in misrepresenting the Vioxx / warfarin drug interaction you also misrepresent Vioxx's safety profile by minimizing the potentially serious risk of significant bleeding that can result from using Vioxx and warfarin concomitantly.

Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile.

## Background

Vioxx is a NSAID with selective cyclooxygenase 2 (COX-2) inhibitory properties. It was approved on May 20, 1999, for the treatment of primary dysmenorrhea, for the management of acute pain in adults, and for relief of the signs and symptoms of osteoarthritis.

Prior to approval, endoscopy studies were submitted to the original NDA database demonstrating that treatment with Vioxx 25 mg or 50 mg daily was associated with a significantly lower percentage of endoscopically apparent gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. Because the correlation between findings of endoscopic studies and the relative incidence of clinically serious upper gastrointestinal (GI) events was unknown, after approval, Merck sponsored the VIGOR study to obtain information regarding clinically meaningful upper GI events and to develop a large controlled database for overall safety assessment.

The VIGOR study included approximately 4000 patients per treatment arm (Vioxx 50 mg a day or naproxen 1000 mg a day) treated for a median time of 9 months. The primary endpoint of the study was the relative risk of confirmed PUBs (perforations, symptomatic ulcers, and GI bleeds) in patients with rheumatoid arthritis taking Vioxx 50 mg daily (two to four times the approved dosing regimen for Vioxx in osteoarthritis), compared to patients taking naproxen, 1000 mg daily. The. study also compared the safety and tolerability of the two treatments in patients with rheumatoid arthritis. The results of the study demonstrated that patients on Vioxx had a significantly lower cumulative incidence of PUB'S compared to patients on naproxen (2.08% and 4.49% for Vioxx and naproxen, respectively).

Other important results from the VIGOR study included the unexpected findings that investigator reported serious cardiovascular events occurred in 101 patients (2.5%) in the

Vioxx treatment group compared to 46 patients (1.1 %) in the naproxen treatment group, and MIs occurred in 20 patients among 4047 in the Vioxx treatment group (0.5%), compared to four patients among 4029 in the naproxen treatment group (0.1%). These unexpected findings were extensively discussed at the FDA Arthritis Advisory Committee Meeting on February 8, 2001. Although, the reason for these differences is not clear, possible explanations include both an ability of naproxen to function as a cardioprotective agent and a pro-thrombotic property of Vioxx.

**Promotional Audio Conferences**

We are aware of six promotional audio conferences, presented on behalf of Merck by Peter Holt, MD that are in violation of the Act and its implementing regulations. These audio conferences were held on June 8, 2000, June 13, 2000, June 16, 2000, and three on June 21, 2000, and were moderated by Merck employees.

On December 12, 2000, we sent you a written inquiry about your involvement with and influence on the initiation, preparation, development, and publication of audio conferences given by Dr. Holt. We also asked you to describe the nature of the relationship between you and Dr. Holt. In your response dated January 5, 2001, you stated that, "Dr. Holt entered into a speaker contract with Merck on June 22, 1999." You also stated that, "Merck has determined that we arranged for Dr. Holt to speak at ten audio conferences in 2000. Merck Business Managers provided him with the topic for the audio conferences and, for two of the audio conferences, asked him to address the safety profiles of Vioxx and other NSAIDs."

The promotional audio conferences identified above, arranged by, and presented on behalf of, Merck were false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx / Cournadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved dosing regimen. Our specific objections follow.

Minimization of MI Results

Statements made during the promotional audio conferences identified above minimize the potentially serious MI risk that may be associated with Vioxx therapy. For example, in your June 21, 2000, audio conference you begin your discussion of the MI rates observed in the VIGOR study by stating, "When you looked at the MI rate the rate was different for the two groups. The MI rate for Vioxx was 0.4 percent and if you looked at the Naprosyn arm it was 0.1 percent, so there was a reduction in MIs in the Naprosyn group." You then present your explanation as to why the Vioxx treatment arm had an increased rate of MIs compared to the naproxen treatment arm. Specifically, you state that,

Vioxx is a wonderful, effective, selective COX-2 inhibitor that inhibits COX-2 but at the doses used does not inhibit COX-1. So therefore without the COX-1 inhibition you don't inhibit platelets, you don't prolong bleeding time and therefore it cannot be used as a

cardiovascular protective drug.  Naprosyn on the other hand is a wonderful platelet inhibitor, prolongs bleeding time and inhibits platelets identically to aspirin. Obviously the binding with Naprosyn is reversible and with aspirin is irreversible, but the effect on platelets and bleeding time is identical in terms of its effect and therefore functions as a wonderful drug for cardiovascular prophylaxis. So basically the MI rates are in sync with what we know about Vioxx and what we know about Naprosyn.

In fact, the situation is not at all clear.  There are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs.  Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading, and minimizes the potential seriousness of this finding. As you know, the reason for the difference between Vioxx and naproxen has not been determined; it is also possible that Vioxx has pro-thrombotic properties.  Also, the MI rate that you report for Vioxx is inaccurate; the MI rate for Vioxx in the VIGOR study was 20 MIs among 4047 patients (0.5%), not 0.4%, as you stated.

Your minimization of the seriousness of the MI rates observed in the Vioxx treatment arm of the VIGOR trial is further reinforced in your audio conferences by your discussion of a retrospective analysis of this trial.  For example, in your June 21, 2000, audio conference, you state that,

...Merck went and pulled out those patients that again were enrolled in VIGOR and asked the question, who were those patients that really needed secondary cardiovascular prophylaxis from the get go, and that ended up being four percent of the study group in VIGOR based on whether there was a prior MI, stroke, TIA, angina, CABG or PTCA.... Now if you look at the remaining part of VIGOR, which is 96 percent of the VIGOR population, and once again looked for the MI rate between Naprosyn and Vioxx, there's no statistically significant difference in the MI rate between Naprosyn and Vioxx. In fact, Naprosyn is 0.2 percent and Vioxx is 0.1 percent.

Your claim that the MI rate for naproxen was 0.2 percent and for Vioxx was 0.1 percent is again. inaccurate.  Contrary to your claim that there was a higher rate of MIs in the naproxen group compared to the Vioxx group, the MI rate for Vioxx in this subpopulation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs among 3878 patients (0.1%) for naproxen.

Moreover, you again minimize the Vioxx MI rate observed in the VIGOR study by your comparison of this rate to the rate of MIs observed for Celebrex (celecoxib) in the Celebrex Long-Term Arthritis Safety Study (CLASS). For example, in your June 21, 2000, audio conference you state, "Now if you remember the crude MI rate of Vioxx in VIGOR that number was 0.4 percent which is basically the same or in fact a little bit less then the crude MI rate of Celebrex in CLASS which is 0.5 percent." Your claim that the MI rates of Vioxx compared to Celebrex were basically the same, "or in fact a little bit less" is misleading.  You are comparing MI rates from two different trials with different

patient populations. For example, patients who had angina or congestive heart failure with symptoms that occurred at rest or minimal activity and patients taking aspirin, including low-dose (325 mg or less, daily or every other day) or other antiplatelet agents (e.g., ticlopidine) were excluded from the VIGOR trial. The CLASS trial in contrast, did not exclude patients of this type. The CLASS trial thus may have included patients at a higher risk for MIs.

<u>Minimization of Vioxx / Coumadin Interaction</u>

Statements made during your promotional audio conferences also minimize the risk of Vioxx therapy in patients who are taking warfarin. For example, in your June 16, 2000, audio conference you stated that, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." Your statement that Vioxx can be used safely with warfarin minimizes the precaution in the PI that states that "...in post-marketing experience, bleeding events have been reported, predominately in the elderly, in association with increases in prothrombin time in patients receiving Vioxx concurrently with warfarin." Your promotion minimizing the risk of using Vioxx and warfarin concurrently is particularly troublesome because Merck was aware of this potentially dangerous drug interaction in 1999, well before these audio conferences occurred. In fact, Merck began disseminating a revised PI in October 1999, which included new information about this risk.

The seriousness of this interaction is further minimized by your suggestion that COX-2 inhibitors, including Vioxx, can be used safely with warfarin because it "has the benefit of not having platelet aggregation and bleeding time." This clam implies that Vioxx is safer than other NSAIDS used in combination with warfarin. However, Vioxx has not been studied in head-to-head trials prospectively designed to assess this specific endpoint. Your superiority claim is therefore misleading.

We note that earlier in your June 16, 2000, promotional audio conference you state, "It can be used in people with Coumadin, although with Coumadin you've got to check their INR three and four days after you add the Cox inhibitor to the Coumadin because there may be a bump in the INR." This disclosure does not correct the overall misleading message, however, nor does it correct your suggestion that Vioxx is safer than other NSAIDs in patients taking warfarin.

<u>Omission of Important Risk Information</u>

Your promotional audio conferences fail to present serious and significant risks associated with Vioxx therapy. For example, your promotional audio conferences fail to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. You also fail to present the gastrointestinal (GI) warning about the possibility of serious GI toxicity such as bleeding, ulceration, or perforation in patients taking Vioxx. Moreover, you fail to present Vioxx's precautions for use in patients who have liver and kidney disease, information about

17

patient populations in which Vioxx's use is not recommended, such as women in late pregnancy, and information about Vioxx's most common adverse events.

<u>Unsubstantiated Superiority Claims</u>

You make several unsubstantiated superiority claims for Vioxx throughout your promotional audio conferences. For example, in your June 16, 2000, audio conference, you claim that, "The importance of [VIGOR and CLASS] is that the data is going to really help change I believe the package inserts for [Vioxx and Celebrex] down the road because it really shows once again that they are safer than nonsteroidals." Your suggestion that COX-2 inhibitors, including Vioxx, have an overall safety profile that is superior to other NSAIDs is misleading because such an advantage has not been demonstrated. In fact, in the VIGOR study the incidence of serious adverse events was higher in the Vioxx treatment group than in the naproxen treatment group (9.3% and 7.8% for Vioxx and naproxen, respectively). The results of safety analyses that were pre-specified in the protocol for the VIGOR trial, such as CHFrelated adverse events and discontinuations due to edema-related adverse events, hepatic-related adverse events, hypertension-related adverse events, and renal-related adverse events were all numerically higher (in some cases statistically significantly higher) in the Vioxx treatment group than in the naproxen treatment group_ Furthermore, your claim that the VIGOR and CLASS trials "show once again that they are safer than non-steroidals" is also misleading because it implies that the results of the VIGOR trial (i.e., patients on Vioxx had a significantly lower cumulative incidence of PUBS than patients on naproxen) can be applied to the entire class of NSAIDs.

In your June 16, 2000, audio conference you state, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." This claim suggests that Vioxx is safer, or has fewer side effects, than other NSAIDs used in the post-operative setting because COX-2 inhibitors do not affect platelet aggregation and bleeding time. Vioxx has not been studied, however, in head-to-head trials prospectively designed to assess its safety compared to other NSAIDS in the post-operative setting. Your superiority claim is therefore misleading.

Further examples of your unsubstantiated superiority claims include your claim that, "In terms of half life Vioxx has a half life of 17 hours and is truly a once a day drug, whereas Celebrex has a half life of 1 I hours and is a BID (twice a day) drug," stated in your June 16, 2000, audio conference. This claim is misleading because it suggests that Celebrex must be dosed twice a day for all of its approved indications. In fact, Celebrex is approved for use either twice a day, or once a day, for the treatment of osteoarthritis. Therefore, your claim that Celebrex is a "BID drug" is misleading.

<u>Promotion of Unapproved Uses</u>

Your audio conferences are misleading because they promote Vioxx for unapproved uses. For example, in your June 21, 2000, conference, you claim that in the VIGOR study, "...the Vioxx 50 milligrams a day and the Naprosyn, a gram a day, were absolutely equally effective in terms of treating the patients with rheumatoid arthritis." Your claim is misleading because it suggests that Vioxx is effective for the treatment of rheumatoid arthritis when this has not been demonstrated. The VIGOR study was not designed to assess the efficacy of Vioxx for the treatment of rheumatoid arthritis. Your claim that Vioxx is "absolutely equally effective" to naproxen in treating patients with rheumatoid arthritis is also misleading because this has not been demonstrated by adequate and well-controlled clinical studies, and because the VIGOR study was not capable of assessing their comparative effectiveness.

Your promotional audio conferences are also misleading because they suggest that Vioxx is safe and effective for other unapproved uses such as the prevention of cancer and invasive cancer, and for the treatment of Alzheimer's disease and gout. Examples of claims that promote Vioxx for unapproved uses, include, but are not limited to, your claims in your June 16, 2000 audio conference that, "...COX-2 seems to be able to interfere with ... programmed cell death. Therefore, you get this increased cell growth which allows polps to form, cancer and then invasive cancer. And by blocking COX-2 you can actually prevent the development of colon polyps, cancer and invasive cancer." Additional examples include your claims that "So we tried it [Vioxx] after Vioxx was released and really within one or two pills acute attacks o£ gout were being shut down," and "Specifically, if you looked at potential uses of these drugs, the most exciting right now I guess in two areas, one is Alzheimer's disease...."

**Press Release**

We have identified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above. Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the naproxen treatment group (46 events, 1.1%) in the VIGOR study.

**Oral Representations**

Merck sales representatives have engaged in false or misleading promotional activities that also minimize the potentially serious MI results observed in the VIGOR trial. Specifically, Merck sales representatives made false or misleading statements to DDMAC reviewers at two different professional meetings. At your exhibit booth during the 119th Annual Meeting of the Maryland Pharmacists Association (MPhA), in Ocean City, Maryland, June 9 - June 12, 2001, your representative stated that the increased MI rate seen in patients on Vioxx in the VIGOR study is due to the fact that naproxen works

just like aspirin (i.e., inhibits clotting and platelet aggregation).  In addition, during the Annual Meeting of the American Society of Health-Systems Pharmacists (ASHP), in Los Angeles, California, June 3 - June 6, 2001, your representative stated that Vioxx had a greater MI rate in the VIGOR trial because naproxen is cardioprotective, having platelet effects similar to aspirin.  These statements made by your sales representatives are misleading for the reasons stated above.

**Conclusions and Requested Actions**

The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx. / Cournadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.   This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages.  This corrective action plan should also include:

1. Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.
2. Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information.  This proposed letter should be submitted to us for review prior to its release.  After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.
3. A written statement of your intent to comply with "I" and "2" above.

Your written response should be received no later than October 1, 2001.  If you have any questions or comments, please contact Lesley Frank, Ph.D., JD, by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-42, Rm. 1713-20, 5600 Fishers Lane, Rockville, MD 20857.  We remind you that only written communications are considered official.

In all future correspondence regarding this particular matter, please refer to MACMIS ID #9456 in addition to the NDA number.

The violations discussed in this letter do not necessarily constitute an exhaustive list.  We are continuing to evaluate other aspects of your promotional campaign for Vioxx, and

may determine that additional remedial messages will be necessary to fully correct the false or misleading messages resulting from your violative conduct.

Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

Sincerely,


Thomas W. Abrams, R.Ph., MBA
Director
Division of Drug Marketing,
    Advertising, and Communications

**EXHIBIT "B"**

# Comment

Published online
November 5, 2004
http://image.thelancet.com/

Today we publish results from a cumulative meta-analysis which show that the unacceptable cardiovascular risks of Vioxx (rofecoxib) were evident as early as 2000—a full 4 years before the drug was finally withdrawn from the market by its manufacturer, Merck. This discovery points to astonishing failures in Merck's internal systems of postmarketing surveillance, as well as to lethal weaknesses in the US Food and Drug Administration's regulatory oversight. In a recent Editorial, we commended Merck for acting promptly in the face of new findings about the safety of Vioxx.[1] Our praise was premature. The evidence showing that Vioxx caused significant adverse events was apparent well before data from the APPROVe trial triggered Merck's overdue intervention. This week's report by Peter Jüni and colleagues will add significant weight to ongoing litigation against Merck by patients who believe they were harmed by this drug.

These findings also come in the wake of new disclosures that suggest Merck was indeed fully aware of Vioxx's potential risks by 2000. Investigations by the *Wall Street Journal*[2] have revealed e-mails that confirm Merck executives' knowledge of their drug's adverse cardiovascular profile— the risk was "clearly there", according to one senior researcher. Merck's marketing literature included a document intended for its sales representatives which discussed how to respond to questions about Vioxx—it was labelled "Dodge Ball Vioxx". Given this disturbing contradiction— Merck's own understanding of Vioxx's true risk profile and its attempt to gloss over these risks in their public statements at the time—it is hard to see how Merck's chief executive officer, Raymond Gilmartin, can retain the confidence of the public, his company's most important constituency.

The FDA's position is no less comfortable. The public expects national drug regulators to complete research, such as that published by Jüni and colleagues, in their ongoing efforts to protect patients from undue harm. But, too often, the FDA saw and continues to see the pharmaceutical industry as its customer—a vital source of funding for its activities—and not as a sector of society in need of strong regulation.

Worse still, the FDA's Office of Drug Safety co-exists in the same centre—the Centre for Drug Evaluation and Research (CDER)—as the Office of New Drugs, the part of the agency that works most closely with industry to license new medicines. Once a licensing approval has been made it is naturally in CDER's own interests to stand by its original decision. CDER's reputation would be damaged if its licensing judgments were constantly challenged by its own staff. This understandable but dangerous tendency to discourage dissent makes the Office of Drug Safety, which sits lower in the hierarchy of CDER than the Office of New Drugs, weak

and ineffective. The inherent precedence that licensing of
new drugs takes over safety evaluation is a serious flaw in
FDA's complex regulatory structure.

In the case of Vioxx, FDA was urged to mandate further
clinical safety testing after a 2001 analysis suggested a
"clear-cut excess number of myocardial infarctions".[3] It did
not do so. This refusal to engage with an issue of grave clinical
concern illustrates the agency's in-built paralysis, a
predicament that has to be addressed through fundamental
organisational reform.

On Nov 2, 2004, the FDA tried to shore up its tarnished
reputation by posting on its website an early version of a
recently completed observational study into the safety of
Vioxx. The report comes with a warning that it has "not
been fully evaluated by the FDA and may not reflect the
official views of the agency". The FDA investigators estimate
that over 27 000 excess cases of acute myocardial
infarction and sudden cardiac death occurred in the USA between
1999 and 2003. "These cases", they write, "would
have been avoided had celecoxib been used instead of
rofecoxib". This study is presently under review at
The Lancet. It is unclear why the FDA could not have waited
for the fully evaluated report to have been scrutinised,
revised, and published according to the norms of scientific
peer review. Bypassing independent peer review smacks of
panic in the FDA, which is under intense reputational pressure.
And yet its decision to try to undermine the integrity
of this work again shows that the agency's senior management
is more concerned with external appearance than
rigorous science.

The licensing of Vioxx and its continued use in the face of
unambiguous evidence of harm have been public-health
catastrophes. This controversy will not end with the drug's
withdrawal. Merck's likely litigation bill is put at between
US$10 and $15 billion. The company has seen its revenues
and market capitalisation slashed. It has been financially
disabled and its reputation lies in ruins. It is not at all clear
that Merck will survive this growing scandal.

But the most important legacy of this episode is the continued
erosion of trust that public-health institutions will
suffer. Failure to act decisively on signals of risk might minimise
short-term political criticism for regulators, or shareholder
unrest for company chief executives. But the
long-term consequence of prevarication is a tide of public
scepticism about just whose interests drug makers and
regulators truly represent.

It is no good saying, as some academic physicians have
said to me, that one must expect pharmaceutical companies
to do all they can to protect their products, even in the
face of clear evidence of risk. And it is of little help to suggest
that regulators have a nearly impossible job of balancing
harms and benefits. Defenders of our systems of drug
regulation argue that the blame for the Vioxx debacle in-
stead rests on allegedly credulous specialists who should
have asked tougher questions about the drug they were
prescribing. Why clinical investigators studying Vioxx did
not do more to raise concerns is a fair question that needs
to be answered. But in doing so, we must not diminish the
importance of the covenant of trust that society has established

with powerful commercial and governmental institutions. For with Vioxx, Merck and the FDA acted out of ruthless, short-sighted, and irresponsible self-interest.

*Richard Horton*

*The Lancet*, London NW1 7BY, UK

1  Editorial. Vioxx: an unequal partnership between safety and efficacy. *Lancet* 2004; **364:** 1287–88.

2  Matthew AW, Martinez B. E-mails suggest Merck knew Vioxx's dangers at early stage. *Wall Street Journal* Nov 1, 2004: A1.

3  Topol EJ. Failing the public health—rofecoxib, Merck, and the FDA. *N Engl J Med* 2004; **351:** 1707–09.

**1996** www.thelancet.com **Vol 364 December 4, 2004**